# UNITED STATES DISTRICT COURT
for the
Eastern District of California

| | |
|---|---|
| In the Matter of the Search of )<br>THE CELLULAR TELEPHONE ASSIGNED )<br>CALL NUMBER (661) ███████ )<br>BEARING IMSI 310280086339100, THAT IS )<br>STORED AT PREMISES CONTROLLED )<br>BY AT&T ) | Case No. 5:25-sw-00052-CDB |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____Northern_____ District of _____Texas_____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 USC Sections 841(a)(1), 846 | Conspiracy to Distribute & Possess with Intent to Distribute Controlled Substances; Distribution of & Possession with Intent to Distribute Controlled Substances |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Miguel Leon*
*Applicant's signature*

Miguel J. Leon, Special Agent, DEA
*Printed name and title*

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date: November 6, 2025

*/s/ Christopher D. Baker*
*Judge's signature*

City and state: Bakersfield, California

Christopher D. Baker, U.S. Magistrate Judge
*Printed name and title*

| | |
|---|---|
| ERIC GRANT<br>United States Attorney<br>KAREN A. ESCOBAR<br>Assistant United States Attorney<br>2500 Tulare St., Suite 4401<br>Fresno, CA 93721<br>Telephone: (559) 497-4000<br>Facsimile: (559) 497-4099<br><br>Attorneys for Plaintiff<br>United States of America | |

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of:<br><br>INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER (661) ███████, BEARING IMSI 310280086339100, THAT IS STORED AT PREMISES CONTROLLED BY AT&T | AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A WARRANT TO OBTAIN PRECISE LOCATION DATA FROM A CELLULAR TELEPHONE<br><br>**UNDER SEAL** |

I, Miguel J. Leon, being first duly sworn, hereby depose and state as follows:

### I. INTRODUCTION AND AGENT BACKGROUND

I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number (661) ███████, bearing IMSI 310280086339100 ("the **TARGET CELL PHONE**"), that is stored at premises controlled by AT&T, a wireless telephone service provider headquartered at 208 S. Akard Street, Suite 2954, Dallas, Texas 75202. The information to be searched is described in the following paragraphs and in Attachment A, attached hereto and incorporated herein by reference. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require AT&T to disclose to the government copies of the information further described in Section I of Attachment B, attached hereto and incorporated herein by reference. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of

1

Attachment B.

1. I am a Special Agent with the Drug Enforcement Administration (DEA), and have been since July 2022. I have been assigned to the DEA's Bakersfield Resident Office in Bakersfield, California. As part of my training, I received 16 weeks of training in the area of narcotics investigations at the DEA Justice Training Center in Quantico, Virginia. I have been the case agent and assisted other agents and officers in investigations on cases involving controlled substance violations, including violations of Title 21, United States Code, Sections 846 and 841(a)(1)–Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances; and Title 21, United States Code, Section 841(a)(1)–Distribution of and Possession with Intent to Distribute Controlled Substances. Specifically, those investigations have focused on the manufacture, distribution, and possession with intent to distribute marijuana, methamphetamine, fentanyl, heroin and cocaine. I am familiar with, and have participated in, conventional investigative methods, including, but not limited to, electronic surveillance, visual surveillance, questioning of witnesses, search warrants, confidential informants, pen registers, and trap and trace. Through my training and experience, I have become acquainted with the identification of various controlled substances.

2. I have received training in and/or participated in investigations involving the interception of both wire communications and the electronic communications of cellular telephones. I am familiar with the ways in which drug traffickers conduct their business, including, but not limited to, their methods of importing and distributing controlled substances, their use of cellular telephones and other cellular network electronic communication devices, and their use of numerical codes and code words to conduct their transactions. I also know from my training and experience that narcotic traffickers put communication devices in the names of associates and/or relatives. The use of false names and identifications is a method to impede law enforcement investigations into the true identity of the subscriber and user of the communication device.

3. I have worked and conferred with various experienced law enforcement officers who were trained in narcotic investigations, and I have drawn from their knowledge and expertise in the field of narcotic enforcement. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2

4. In addition, I am familiar with narcotics traffickers' methods of operation including the distribution, storage, manufacturing, and transportation of narcotics and the collection of money proceeds of narcotics trafficking. I know from my training, experience, and conversations with other law enforcement officers that narcotics traffickers often use fictitious names and identifications for the purpose of subscribing to cellular telephones and hard line telephones. I also know from my training, experience, and conversations with other law enforcement officers that narcotics traffickers put communications devices in the names of associates and/or relatives. The use of these fictitious names and identifications or placing communication devices in associates' or relatives' names is used as a means to impede law enforcement efforts to identify the true user of such communication devices. From my training and experience, I also know that it is common for drug traffickers to use pre-paid cellular telephones as a means to impede law enforcement efforts to identify the true user of such communication devices.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 846 and 841(a)(1)–Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances; and Title 21, United States Code, Section 841(a)(1)–Distribution of and Possession with Intent to Distribute Controlled Substances, have been committed by Natasha Bailey and others. There is also probable cause to search the information described in Attachment A, attached hereto and incorporated herein by reference, for evidence of these crimes as further described in Attachment B.

## II. PROBABLE CAUSE

### A. OVERVIEW OF THOMAS'S DRUG TRAFFICKING ORGANIZATION

7. Kristopher Thomas is a long-time member of the Main Street Mafia Crips (MSMC) and an inmate at Kern Valley State Prison in Delano, California where he is serving a 50-year to life sentence for a gang-related murder in the first degree. He is eligible for parole in 2033. He has an

extensive criminal history dating back to 2003, including prior convictions for controlled substance offenses in 2006 and 2016. The investigation has revealed that from on or about July 12, 2022[1], to on or about December 17, 2022, Thomas was the head of a drug trafficking organization (DTO) that was responsible for the shipment of large quantities of methamphetamine to Hawaii, Oklahoma, Alabama, and New Jersey, as well as the smuggling of fentanyl into Kern Valley State Prison on or about September 9, 2022.

8. DEA agents in Hawaii initiated the investigation of Thomas based on information from a reliable confidential source that he/she had received hundreds of pounds of methamphetamine from an individual known as "Broski," who was later identified as Thomas. Subsequent recorded negotiations with Thomas resulted in the seizure in Oahu, Hawaii of over 90 pounds of methamphetamine. The Hawaii transactions formed, in part, the basis for the initiation of a wiretap investigation of Thomas by DEA agents in Bakersfield within the Eastern District of California. From August 2022 to March 2023, DEA agents identified seven contraband cell phones that Thomas used at Kern Valley State Prison and received authorization to intercept communications from six of these phones. Those intercepts led to the seizure of an additional 54 pounds of methamphetamine in Oklahoma and Alabama and over half a pound of fentanyl which was smuggled into Kern Valley State Prison by Bailey and other co-conspirators who aided and abetted the smuggling.

9. Justin Mitchell is an associate of Thomas and is a known member of the MSMC. Wire intercepts and other evidence, as discussed below, indicate that he was involved in conspiring to smuggle the fentanyl into Kern Valley State Prison, as well as the distribution of methamphetamine to Oklahoma, Alabama, and New Jersey.

10. Wire intercepts and other evidence, as discussed below, indicate that Natasha Bailey participated in the conspiracy to distribute fentanyl into Kern Valley State Prison by actually smuggling it into the prison during a visit with Derrick D. Charles, an inmate at Kern Valley State Prison.

///

///

---

[1] Any and all references herein to dates and times are to approximate dates and times.

4

B. **The DEA Bakersfield Wiretap Investigation Resulted in the Identification of Additional Co-Conspirators and Seizure of Over 54 Pounds of Methamphetamine and Fentanyl Smuggled into Thomas's Prison**

11. On August 11, 2022, U.S. District Judge Dale A. Drozd of the U.S. District Court for the Eastern District of California authorized the interception of wire communications of telephone number (808) 284-8942, Target Telephone 1, under Case Number 1:22-sw-0354-DAD. The interception of wire communications commenced the same day. Coincidentally, the phone number for Target Telephone 1 changed to (323) ▮▮▮-▮▮▮▮, Target Telephone 2, on the same day; however, the IMSI for the new number did not change. Because the Court had authorized the interception of wire communications for any changed number with the same IMSI, agents were able to monitor the communications over Target Telephone 1. Wire communications were monitored for approximately five days. During that time, it was determined that Thomas, the user of Target Telephone 2, was actually incarcerated at the Kern Valley State Prison for a first-degree murder conviction. During an intercepted call on August 13, 2022, Thomas identified his cellmate by his full name, Nathaniel Flowers, who is a Geer Gang Crip member.[2] Based on this information, DEA SA Devin Callahan contacted Lieutenant Ruben Molina of the Kern Valley State Prison and confirmed that Thomas was Nathaniel Flowers' cellmate. In addition, during other intercepted calls, callers referred to Thomas as "Kris," a shortened version of his first name, Kristopher.

12. Upon learning of Thomas's custodial status, agents terminated the wire on August 16, 2022, to ensure that appropriate protocols were in place to re-initiate the interception of wire, as well as electronic, communications of a cellular telephone utilized by a state prison inmate. DEA SA Gray and DEA Bakersfield case agents compared previously recorded telephone calls between the CS and Thomas with intercepted wire communications and determined that the voices are the same. Historical cell site information for the phone number that Broski provided to the CS indicates that the phone was activated in May 2022 and has been located since May 2022 in Delano, California in the Eastern District of California.

---

[2] The Geer Gang Crips are a street gang located in the West Adams District of South Los Angeles.

C. **Mitchell Was Identified as a Member of the Thomas DTO.**

13. On August 15, 2022, at 3:08 p.m., Thomas received a brief call on Target Telephone 2 from telephone number (562) ███-███, which was subscribed to by Justin Mitchell and identified as the phone number used by Justin Mitchell. The following is a transcript of the contents of the call:

THOMAS: Yo.

MITCHELL: Yo. So you want them done today?

THOMAS: Yes, bro. time's up.

MITCHELL: .or do you. alright bet..[interrupted]

THOMAS: Do them today. Not after 4:30.

MITCHELL: That's what I was saying.

THOMAS: That's an hour n' thirty minutes bro they can at least do one or something.

MITCHELL: That's what I was telling her, we can get one done today. But we probably aren't gonna be able to get . . . [call ended].

14. During this call, Mitchell asked Thomas, "So you want them done today?" Thomas replied, "time's up," and told Mitchell he needed to do them that day before 4:30 pm. Based on my training, experience, and discussions with experienced DEA agents and narcotics investigators, I believe that Mitchell was referring to money that he owed to Thomas, and Thomas was acknowledging while telling Mitchell he needed to pay that day. Subsequent calls suggested that the monies Mitchell owed Thomas represented drug debts or proceeds from drug sales.

15. At 3:22 p.m., Thomas received a call on Target Telephone 2 from Maeshack, using (714)███████. During this call, Maeshack said that a third party was 5 minutes away. Thomas responded by saying a fourth party was also 5 minutes away. Maeshack then described an assortment of money expected to be delivered, totaling approximately $28,000 in cash and money orders. At 3:37 p.m., Thomas received a call from Maeshack, who explained to Thomas that the third party would be short on the money.

16. At 3:40 pm, Thomas received a call on Target Telephone 2 from Maeshack, using (714)███████. A transcribed excerpt of that call indicates they discussed methamphetamine and prices, as follows:

| | |
|---|---|
| 1 | MAESHACK: . . .he out here selling, they keeping coming down to TJ week for the 125, bruh, |
| 2 | they got that shit going bonkers, cuh . . . |
| 3 | THOMAS: Yeah I asked the nigga how much a "P" for he gonna tell us 1,800. I'm saying, |
| 4 | bruh, I said there ain't no way you buyin 'em for 1,800 and selling them for 125 |
| 5 | for the zip. You think we believe that? |
| 6 | MAESHACK: It's been like that. So he prob buyin 'em for 1,200 you feel me? |
| 7 | THOMAS: He going bonkers though he got all you niggas buyin it so . . . |
| 8 | MAESHACK: You can't beat it, you feel me? You can't beat it. 125 for an ounce? Shit, I sell that |
| 9 | mu'fucker for 250 my niggas. Smoke for free. |

17. Based on my training, experience, and discussions with experienced DEA agents and narcotics investigators, I believe the foregoing conversation indicates that Thomas and Maeshack were discussing the prices of methamphetamine being sold by a third party. When they mentioned the price of a 'P' being "1,800," I believe they were referring to a pound of methamphetamine costing $1,800, which is within the average range of prices for methamphetamine in the Los Angeles area at that time. Maeshack then indicated that selling an ounce of methamphetamine for $125 is good, because he can then sell that ounce for $250.

18. Later in the same call, Thomas can be heard talking to someone else (possibly on a different phone) giving them directions for how to count the money, as indicated by the following transcribed excerpts:

THOMAS: She said one was supposed to be vacuum sealed, right?

MAESHACK: Two vacuum sealed, one says 10, one says 15 on it.

THOMAS: [speaking to third party] Scrap, one say 10, one say 15, and then, and then the other shit is loose money with the money orders. [now speaking to Maeshack] Alright, so you want Scrap to leave it like that?

MAESHACK: Nah she can open it and count it cuz it gonna have to get opened up anyways.

THOMAS: [speaking to third party] yeah all the rubber bands gotta come off.

MAESHACK: Just tell her to count it separately, don't mix the bags. It is what it is.

THOMAS: [speaking to third party] tell Scrap to count it separately so when she county the

|  | 10, count the 15, keep it separate. |
|---|---|
| MAESHACK: | When it all adds up to 35, then she can put it together. |
| THOMAS: | [speaking to third party] Then when you count the 10 and the 15 and it all adds up to what it's supposed to be, then put it together. But if its not, you tell us which ain't what it is, you hear me? |

19. Based on my training, experience, and discussions with experienced DEA agents and narcotics investigators, I believe that in the foregoing conversation Maeshack and Thomas were instructing an unknown female money courier, possibly on a separate telephone call with Thomas, how to handle the money once she receives it, as indicated in the next paragraph. Thomas was telling the money courier to expect two vacuum sealed bags, one labeled 15 (for $15,000) and one labeled 10 (for $10,000), and to also expect loose money, along with money orders. Thomas then instructed the money courier to count the money separately to make sure each has the correct amount, equaling 35 (or $35,000) total. Subsequent intercepted calls suggest that Mitchell was the individual who was going to provide the money to Thomas's courier.

20. Later in the same call, there was additional discussion about money, as indicated by the following transcribed excerpt:

| MAESHACK: | Justin just texted me saying he waitin' on you. |
|---|---|
| THOMAS: | Man tell him it's not gonna happen bro. He knows it's not gonna happen bro. It's 30 minutes for that. It ain't gonna happen, cuh. Ain't finna be tryin' to rush shit. Like nah, bro. I already told your man he had an hour and 30 minutes I thought they been was there like 4 o'clock I thought they was already, I mean 3 o'clock I thought they was driving already been gone . . . |

21. Based on my training, experience, and discussions with experienced DEA agents and narcotics investigators, I believe that in the foregoing conversation Thomas and Maeshack were referring to Mitchell being late to deliver money. During the previously mentioned call at 3:08 p.m. on this same day, Thomas told Mitchell he had an hour and 30 minutes to "get one done today." This time frame was reiterated in this telephone call with Maeshack. In addition, I believe Maeshack's reference to "Justin" is likely a reference to Justin Mitchell.

22. At 4:11 p.m., Thomas placed an outgoing call using Target Telephone 2 to Maeshack. During this conversation, which was possibly a three-way call including Mitchell, there was a lengthy argument over how much money Mitchell had delivered to the female courier.

23. Based on my training, experience, and discussions with experienced DEA agents and narcotics investigators, I believe the foregoing calls indicate that Mitchell likely owed drug proceeds to Thomas, who indicated that "the time is up" and therefore Mitchell needed to pay his debt that day. Thomas sent a female money courier to receive $35,000 from Mitchell. Based on the aforementioned three-way call with Thomas, Maeshack, and Mitchell, it appears that the money was in fact delivered, but was short.

### D. Bailey and Charles Were Also Identified as Thomas's Co-Conspirators After Smuggling Fentanyl into Kern Valley State Prison.

24. The interception of wire and electronic communications from Target Telephone 2 was again authorized on September 2, 2022, by U.S. District Judge Jennifer L. Thurston under Case Number 1:22-SW-00386-JLT.

25. On September 8, 2022, toll records for (661) ▮▮▮▮▮▮▮ ("**TARGET CELL PHONE**") indicate that at 8:37 a.m. Derrick D. Charles, an inmate at Kern Valley State Prison, called Natasha Bailey. The provider for the **TARGET CELL PHONE** was AT&T and the number was subscribed to by Natasha Green, a name that Bailey has used in the past, according to Experian credit reports. Green is believed to be Natasha Bailey's maiden name, since her mother is named Lydia Green.

26. Toll records for the **TARGET CELL PHONE** indicate that at 10:34 a.m. Bailey texted Charles.

27. From September 8, 2022, at 8:37 a.m. to 10:25 a.m. on September 9, 2022, toll records for the **TARGET CELL PHONE** indicate that there were approximately 445 contacts between Charles and Bailey. 118 of those contacts consist of text messages.

28. According to AT&T, the provider for the **TARGET CELL PHONE**, text messages are typically stored at AT&T for only 48 hours. After 48 hours, text messages are not typically accessible. Other than serving legal process on AT&T, the only way to obtain text messages is directly from the cell phones of the individuals who made the texts.

9

29. On September 8, 2022, at 7:55 p.m., Thomas, using Target Telephone 2, made an outgoing call to Mitchell at telephone number 562-203-9474. During this call, Thomas told Mitchell that he needed Mitchell to go to the same place he had gone to "last time." Mitchell asked Thomas if he meant Bakersfield and Thomas confirmed. Thomas told Mitchell to start heading toward Bakersfield to "drop it off." Ensuing wire intercepts, as discussed below, indicated that Thomas was coordinating the smuggling of fentanyl into Kern Valley State Prison for Charles. As explained in more detail below, wire intercepts, toll analysis, physical surveillance, and the seizure of fentanyl from Charles' cell, taken together, indicate that Bailey smuggled the fentanyl into the prison as a result of coordinated activity with Thomas and Mitchell.

30. At 9:15 p.m., Thomas received a text message on Target Telephone 2 from telephone number 323-▮▮▮▮▮▮▮ (subscribed to by ▮▮▮▮▮▮▮, 7314 Mace Place, Los Angeles, California), identified as USER5165 and believed to be used by Thomas's cellmate, Flowers. The text message contained the following address: ▮▮▮▮▮▮▮, Bakersfield, CA. At 9:19 p.m., Thomas sent the same address via text message to Mitchell, followed by, "Thts where ur gonna take it to."

31. At 9:49 p.m., Thomas made an outgoing call on Target Telephone 2 to telephone number 714-▮▮▮▮▮▮▮ (subscribed to by ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮, Gardena, California), used by Maeshack. During the call, Thomas and Maeshack discussed the process of wrapping a narcotics package in electrical tape and Saran wrap before a female uses her vagina to smuggle the package to an inmate inside a prison.

32. At 10:25 p.m., Thomas, using Target Telephone 2, received a text message from 323-371-5165, the phone number associated with Flowers. The text message contained the following address: 5037 E Brundage Lane, Bakersfield, CA, which is the address for a Neighborhood Walmart store. At the same time, Thomas sent the same address to Mitchell. At 10:28 p.m., Thomas sent a picture message to Flowers, which appeared to depict two small packages wrapped in black electrical tape on a table. At 10:37 a.m., Thomas sent Mitchell a text asking, "whts yo eta?" Mitchell replied with the text messages "2hr 30" and "1am."

33. At 10:41 p.m., Thomas, using Target Telephone 2, sent a text message to Mitchell stating, "Ima send u his number so if I'm sleep u can call him." At 10:42 p.m., Thomas, using Target

Telephone 2, made an outgoing phone call to telephone number 661-▇▇▇▇ (subscribed to ▇▇▇▇▇▇▇▇▇▇, Los Angeles, California), used by an unidentified male referenced as UM6954. During this call, Thomas asked UM6954 if he was going to be awake. UM6954 said that he "didn't have a choice." Thomas indicated to UM6954 that he had given "him" referring to Mitchell, his number to call once he gets out there, referring to Bakersfield. Thomas told UM6954 that he, referring to Mitchell, had 2 bundles and 2,000. Based on toll analysis, investigators believe the user of 661-901-6954 was Charles. Later in the investigation, this was further corroborated when the prison was temporarily placed on lockdown for a few weeks following a prison riot, and toll records show that the number associated with Charles was not in use during the lockdown period.

34. At 10:46 p.m., the phone number associated with Flowers sent a text message to Thomas, using Target Telephone 2, which stated, "75 gs in each 1."

35. At 10:57 p.m., toll records show Mitchell called Charles.

36. At 11:05 p.m., Charles called Bailey on a cell phone assigned the phone number 661-▇▇▇▇ the **TARGET CELL PHONE**.

37. At 11:30 p.m., agents and officers of the DEA Bakersfield Resident Office established surveillance at Neighborhood Walmart, 5037 E. Brundage Lane, Bakersfield, California.

38. On September 9, 2022, at 12:48 a.m., Thomas, using Target Telephone 2, sent a text message to Mitchell asking, "How far out are u?" At 12:49 p.m., Mitchell sent a text message to Thomas stating, "20 minutes."

39. At 1:10 a.m., DEA SA Devin Callahan observed a black Kia SUV bearing CA license plate #▇▇▇▇▇ (registered to ▇▇▇▇▇▇▇▇ and Justin D. Mitchell, ▇▇▇▇▇▇▇▇▇▇▇. ▇, Inglewood, CA) drive into the parking lot of the Neighborhood Walmart. SA Callahan observed the Kia SUV drive towards the south end of the parking lot, where SA Callahan saw that the driver of the vehicle was Mitchell based on a comparison with a picture from the California Department of Motor Vehicles (DMV) for Justin Damonte Mitchell. SA Callahan then saw the Kia SUV drive towards the north side of the Neighborhood Walmart, where it eventually parked.

40. At 1:12 a.m., Thomas, using Target Telephone 2, received a text message from Mitchell stating, "I'm here." Thomas then sent a text message to Charles stating, "He's there." At 1:13 a.m.,

11

1 Thomas sent a text message to Mitchell stating, "Call him."

41. Toll records show that at 1:13 a.m., Charles received a call from Mitchell and then three minutes later, at 1:16 a.m., Charles made a call to Bailey.

42. At 1:19 a.m., DEA SA Sasha Engle observed a white Chevrolet sedan bearing California license plate # ▇▇▇▇▇ (registered to ▇▇▇▇▇, ▇▇▇▇▇, Bakersfield, California) enter the parking lot of the Neighborhood Walmart. SA Engle determined that the driver of the white sedan was possibly an African American female. SA Engle observed the white Chevrolet drive toward the black SUV and proceed to park in the stall directly east of it. SA Engle observed a door open from the black SUV, but was unable to determine who exited the vehicle. Shortly thereafter, both vehicles exited the parking lot.

43. Toll records show at 1:17 a.m., Charles called Mitchell. Approximately five minutes later, at 1:22 a.m., Charles again called Bailey.

44. At 1:31 a.m., Thomas, using Target Telephone 2, received a text message from Mitchell stating, "I did she got everything." Thomas then responded to Mitchell, "Good looking."

45. At 8:00 a.m., SA Callahan contacted Lieutenant Molina of the Kern Valley State Prison to inform him of a possible delivery of controlled substances to someone within the person who is associated with Thomas.

46. At 12:53 p.m., an officer of the Kern Valley State Prison spotted a white Chevrolet sedan in the visitor's parking lot of the prison. Lieutenant Molina was able to determine that the driver of the white Chevrolet was Natasha Bailey, who presented her identification to prison security to visit Derrick D. Charles, a Westside Bakersfield Crip gang member who then occupied a cell near Thomas. However, Bailey was not searched. Bailey is an African American female, who has a 2005 conviction for possession of marijuana. Once Bailey's visit with Charles concluded, she returned to the white Chevrolet and left the premises.

47. At 2:00 p.m., officers searched Charles' prison cell and found and seized two packages that were wrapped in black electrical tape. The packages were located under the lower-bunk mattress that was assigned to Charles at the time of the seizure. The packages were consistent in appearance to the packages depicted in the photo that Thomas had texted Flowers. On September 13, 2022, DEA Task

Force Officers retrieved the seized packages from Kern Valley State Prison. A DEA chemist found that the packages contained 255.4 grams (net) of fentanyl, a Schedule II controlled substance.

48. On February 14, 2024, this Court also authorized a criminal complaint and the issuance of arrest warrants (5:24-MJ-0006 CDB) for Thomas, Mitchell, Bailey, and Charles, who were charged with, *inter alia*, conspiring to distribute and possess with intent to distribute fentanyl and methamphetamine. The arrest warrants were then executed on February 22, 2024, with Thomas, Mitchell, Bailey, and Charles being taken into custody.

49. On March 7, 2024, a federal grand jury returned an indictment charging Thomas, Mitchell, Bailey, and Charles with distributing fentanyl on September 9, 2022. They were also charged with a long-ranging drug conspiracy that encompasses the fentanyl smuggling transaction. Charles was individually charged with possessing fentanyl with intent to distribute. Mitchell and Thomas were charged with two separate counts of distributing methamphetamine and Thomas was charged individually with two additional counts of distributing methamphetamine. Mitchell has entered a guilty plea to all charges contained in the indictment.

50. On August 25, 2025, a signed plea agreement was filed in which Bailey acknowledged that she did meet with Mitchell on September 9, 2022, and pick up narcotics; however, she did not acknowledge that she actually smuggled the narcotics into the prison. Bailey's change of plea has also been set and reset several times.

51. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. To ███████████████████ counter a potential claim that Bailey provided the fentanyl to another individual who actually smuggled the drug into the prison, the government seeks to obtain historical cell site and other data for the **TARGET CELL PHONE** on September 8 and 9, 2022, to establish that Bailey, the user of the **TARGET CELL PHONE,** actually smuggled the fentanyl into the prison.

52. Based on my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the

13

locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

53. Based on my training and experience, I know that AT&T can collect cell-site data about the **TARGET CELL PHONE**. I also know that wireless providers such as AT&T typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. In August 2022, AT&T AT&T represented to the Federal Communications Commission that its Record Information Management (RIM) policy establishes a retention period of five years for historical call detail records, which include cell site location information.

54. Based on my training and experience, I know that AT&T also collects per-call measurement data. Per-call measurement data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

55. Based on my training and experience, I know that wireless providers such as AT&T typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as AT&T typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their

14

normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **TARGET CELL PHONE**'s user or users and may assist in the identification of co-conspirators and/or victims.

### III. AUTHORIZATION REQUEST

56. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

57. I further request that the Court direct AT&T to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on AT&T, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

58. I further request that the Court order that the unredacted application, warrant, and sealing order be sealed until further order of the Court. The unredacted documents discusses an ongoing criminal investigation of a potential uncharged co-conspirator that is neither public nor known to all of the targets of the investigation. The unredacted documents also discuss information, such as cell phone numbers, that should not be disclosed publicly to protect the privacy interests of the individuals involved in the fentanyl smuggling transaction. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Miguel J. Leon
Special Agent
Drug Enforcement Administration

Affidavit submitted by email/pdf and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this date, November 6, 2025.

Hon. Christopher D. Baker
U.S. MAGISTRATE JUDGE

15

/s/ Karen A. Escobar
Approved as to form by AUSA KAREN A. ESCOBAR

# ATTACHMENT A

## Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number (661) ▮▮▮▮▮▮ ("the Account"), bearing IMSI 310280086339100, that is stored at premises controlled by AT&T ("the Provider"), headquartered at 208 S. Akard Street, Suite 2954, Dallas, Texas 75202.

# ATTACHMENT B

## Particular Things to be Seized

**I. Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for September 8, 2022, and September 9, 2022:

   a. The following information about the customers or subscribers of the Account:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received as well as per-call measurement data (also known as the "real-time tool" or "RTT" data)].

**II.     Information to be Seized by the Government**

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 846 and 841(a)(1)–Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances and Title 21, United States Code, Section 841(a)(1)–Distribution of and Possession with Intent to Distribute Controlled Substances involving Natasha Bailey on September 8, 2022, and September 9, 2022.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.